Kevin Koelbel, SBN 016599
LAW OFFICES OF KEVIN KOELBEL, P.C.
7303 W. Boston Street
Chandler, AZ  85226
(480) 705-7550
(480) 705-7503 Fax
kevin@koelbellaw.com

Erin Ronstadt, SBN 028362
RONSTADT LAW, P.L.L.C.
1810 West Northern Ave., Ste. A9-301
Phoenix, AZ 85021
(602) 888-0500
(602) 419-2220 Fax
erin@ronstadtlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Ballard, a married man,<br><br>Plaintiff,<br><br>v.<br><br>The International Brotherhood of Electrical Workers Local 769 - Management Pension Plan, a multiemployer defined benefit pension plan; Trustees of The International Brotherhood of Electrical Workers Local 769 - Management Pension Plan, a plan administrator and fiduciaries,<br><br>Defendants. | **No.**<br><br>**COMPLAINT**<br><br>(Unclassified Civil Case: ERISA) |

For his claims against Defendants, Plaintiff Michael Ballard ("Ballard") alleges as follows:

**JURISDICTION, VENUE AND PARTIES**

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2. This action is governed by Arizona law to the extent any claim is not preempted by ERISA.

3. The International Brotherhood of Electrical Workers Local 769 - Management Pension Plan (the "Plan") is a purported ERISA multiemployer defined benefit pension plan established and maintained by the trustees of The International Brotherhood of Electrical Workers Local 769 Management Pension Plan (the "Trustees") for the benefit of eligible Plan Participants.

4. The Plan is established to provide retirement income and death benefits to eligible Participants.

5. A "Participant" means an Employee "on whose account the Employer is required to make contributions under the terms of the Collective Bargaining Agreement."

6. "Union" is defined under the Plan as Local 769.

7. The International Brotherhood of Electrical Workers ("IBEW") is a labor union which represents workers in the electrical industry in the United States, Canada, Panama and several Caribbean island nations; particularly electricians, or Inside Wiremen, in the construction industry and linemen and other employees of public utilities. See http://www.ibew.org.

8. IBEW maintains local autonomy and presence both nationally and internationally through the establishment of local unions.

9. IBEW Local Union 769 ("Local 769") is a local union under the jurisdiction of IBEW.

10. Local 769 has its principal place of business in Phoenix, Arizona and has jurisdiction over all IBEW outside line workers in the state of Arizona, employees of UniSource Electric Company, Mohave Co-Op, Frontier Communications and Griffith Power Plant. The scope of its work also includes tele-data, street light and trenching for Arizona. See http://www.ibew769.com/home.html

11. The Plan is funded pursuant to a Trust Agreement (the "Fund") and all Fund assets are held and managed by the Trustees.

12. Under the Plan, the Trustees are the Plan administrator and are responsible for administration of the Plan.

13. All assets of the Plan are held by the Trustees.

14. The Trustees are the Plan Administrator of the Plan and are "responsible for the day-to-day administration of the Plan and shall have the duty and authority to comply with those reporting and disclosure requirements of ERISA which are specifically required of the Plan Administrator."

15. The Trustees and Trustee Bell exercised authority to make final decisions regarding the payment of pension benefits for the Plan. Accordingly, Defendants are a "named fiduciary" of the Plan, pursuant to 29 USC § 1133(2); a "deemed fiduciary" pursuant to 29 USC § 1002 (21)(A); or a "designated fiduciary," pursuant to 29 USC § 1105(c)(1)(B). Under the Plan, 'Fiduciary' means the Trustees, the Employers, and, to the extent the Fund Manager has any discretionary authority with respect to the Plan's management, the Fund Manager is a fiduciary. Fiduciaries will have certain duties and responsibilities as provided under ERISA. Fiduciaries must perform duties solely in the interest of Participants; "[f]or the exclusive purpose of providing benefits to Participants and their Beneficiaries, [w]ith the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and] [i]n accordance with the Plan."

16. Under the Plan, a Fiduciary is liable as provided by ERISA for any breach of his Fiduciary responsibilities.

17. The Plan Administrator will have the sole responsibility for the administration of the Plan and has discretionary authority to determine benefits payable under the Plan.

18. The Trustees are comprised exclusively of Local 769 administrators or members.

19. At all relevant times, Joel Bell was the Business Manager/Financial Secretary and "Union Trustee" for the Plan. *See* http://www.ibew769.com/officers/officers.htm.

20. At all relevant times, Kay Sobieski was the named "Trust Administrator" for the Plan and acted as a plan administrator with fiduciary responsibilities.

21. On information and belief, either Bell or Sobieski was the "Fund Manager" as defined by the Plan.

22. At all relevant times, Caroline Gardiner was the "Employee Trustee and Chairperson" for the Plan.

23. At all relevant times, Bell, Sobieski and Gardiner exercised discretionary authority with respect to the Plan's management and had fiduciary responsibilities under ERISA and the Plan.

24. Bell, Sobieski and Gardiner directly exercised discretionary authority in denying Ballard's benefits on behalf of the Plan.

25. The Plan's principal place of business in Arizona. Defendants are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within this Court within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

26. LB Line Co., dba Quality Line Co. ("Quality Line") is an Employer as defined under the Plan and is required to make contributions to the Fund on behalf of Eligible Employees.

27. The Collective Bargaining Agreement (the "CBA") means the agreement between Local 769 and Quality Line that sets forth employer contribution requirements for funding the pension benefits provided under the Plan.

28. Once Ballard became an employee of Quality Line, he was subject to the CBA and an Employee eligible for benefits under the Plan.

29. At all relevant times, Ballard was a Participant of the Plan.

-4-

30. Ballard is and at all relevant times was a resident of Maricopa County, Arizona.

31. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

32. Venue is proper in this Court under ERISA, 29 § 1132(e)(1) and 28 U.S.C. § 1391(b).

33. The Complaint is timely filed pursuant to the Plan terms and ERISA.

34. Ballard has properly exhausted all administrative remedies before bringing this Complaint.

## GENERAL ALLEGATIONS

35. Ballard's claims arise as a result of his unknowing participation in the Plan from approximately February 2010 to present day, which occurred because the Trustees knowingly and intentionally failed to reciprocate Ballard's employer contributions to the proper pension plan, as well as failed to notify Ballard of his Plan participation as required by ERISA.

36. On or about 1992, Ballard became an IBEW member and joined IBEW Local Union 125 ("Local 125") in Portland, Oregon.

37. Ballard immediately established pension benefits through The National Electrical Benefit Fund ("NEBF") and the National Electrical Annuity Plan ("NEAP").

38. NEBF, which was established in 1946 as part of an agreement with the IBEW, is affiliated with NEAP. Both NEBF and NEAP work together to provide retirement and related benefits to employees in the electrical industry, including pension and disability benefits separate from Social Security or other pension benefits.

39. NEAP is a multi-employer defined contribution plan that provides retirement and related benefits to employees in the electrical industry. One of the largest Taft-Hartley pension plans in the United States, NEBF manages pension benefits for

1 more than 480,000 current or former electrical workers and has more than $11 billion of assets under management. More than 11,000 employers contribute to NEBF.

40. Under NEAP, "Participants are assigned an Individual Account. The balance of a Participant's Individual Account is the total of contributions received and adjustments due to NEAP's investment performance. A Participant's benefit amount is based upon the balance in the Participant's Individual Account at the time the application is approved." http://www.nebf.com/neap/about_the_plan/

41. Ballard became a NEBF/NEAP participant on or about 1992 at the same time he joined the IBEW.

42. From the time he joined IBEW until on or about 1998, Ballard worked through Local 125 doing outside construction for various contractors.

43. Local 125 always reciprocated employer contributions made on Ballard's behalf to NEBF and NEAP.

44. From 1998 to 2004, Ballard worked exclusively for Enron Portland General Electric ("Enron"), a private utility company. Enron would pay Ballard's IBEW international dues directly to the IBEW International Office, and Ballard would pay his utility dues directly to Local 125, so that these years still counted toward his years as an IBEW union member.

45. While an Enron employee, Local 125 continued to reciprocate contributions to NEBF and NEAP.

46. After Enron, Ballard worked for National Rural Electric Coop Association, now known as Touchstone, and for the Salt River Project ("SRP"). During this time of employment before Quality Line, Ballard paid all of his own dues to IBEW directly through Local 125. He would pay these dues annually to Local 125 to keep his IBEW member status active and to maintain his "A-Ticket." Ballard paid union dues to Local 125 on an annual basis.

47. On or about February 2010, Ballard became an employee with Quality Line working under the CBA.

48. From before 1998 until his employment with Quality Line in 2010, Ballard did not work under any collective bargaining agreements.

49. Under the CBA, Quality Line "shall pay to the Trustees . . . an amount equal to fifteen percent (15%) of the straight time Zone I hourly rate." "These monies shall be payable monthly on or before the fifteenth (15th) of the month succeeding the calendar month for which payment is to be made using the transmittal form and depository designated by the Trustees."

50. While working under the CBA for Quality Line, Ballard remained a member of Local 125 and intended to have any contributions made on his behalf reciprocated to NEBF and NEAP.

*EIPRA and ERTS*

51. Meanwhile, while Ballard was working outside of collective bargaining agreements but still an IBEW member, IBEW continued to work on reciprocating benefits for IBEW members working outside of home jurisdiction.

52. "Since the earliest days of the IBEW, members have hit the road to follow work, leaving their home area to work on projects in another local union's jurisdiction. There was a time when IBEW 'road warriors' took risks other than the normal job hazards like losing proper crediting of their pension and health and welfare benefits." http://www.ibew.org/articles/02journal/0205/ert.htm

53. The National Electrical Contractors Association ("NECA") serves contractors, or employers, in the electrical industry across the United States. http://www.necanet.org/about-us/overview. NECA and the IBEW work together to equally represent both employer and union in the electrical industry. See IBEW History and Structure, rev. 10/05, http://www.ibew.org/IBEW/history/Form%20169%20-%20History%20and%20Structure.pdf.

54. In order to protect traveling members, The Electrical Industry Pension Reciprocal Agreement ("EIPRA") was designed in the 1980s to allow traveling workers who participated in IBEW/NECA pension and health and welfare funds to reciprocate

-7-

pension money earned in traveling jurisdictions back to their selected home fund(s). http://www.ibew.org/articles/02journal/0205/ert.htm

55. At all relevant times, the Plan was a participant of EIPRA.

56. Under the Plan, the Trustees are empowered to set up reciprocity agreements with other trusts to aid in establishing portability.

57. Reciprocity under EIPRA was inefficient, because it "required the processing of paper forms by the plan participants to start their transfers every time they traveled." http://www.ibew.org/articles/02journal/0205/ert.htm

58. On or about May 2002, the IBEW in cooperation with NECA created the IBEW/NECA Electronic Reciprocal Transfer System ("ERTS"), an automated reciprocity system designed to protect IBEW traveling members from losing proper crediting of their pension and health and welfare benefits. ERTS "is web-based and dramatically increases the speed, ease and accuracy of transferring money to members selected home funds." http://www.ibew.org/articles/02journal/0205/ert.htm. ERTS was designed to primarily assist IBEW members in requesting the transfer of pension and health and welfare money (e.g., contributions) back to their home funds no matter where they may be working. https://erts.ibew.com/IBEWERTS/index.htm

59. "The IBEW and NECA have accomplished what members of Congress have only talked about for years, portability of benefits. Now they have worked together to develop a truly state-of-the-art, web-based system that no other union has [by implementing ERTS]." http://www.ibew.org/articles/02journal/0205/ert.htm

*Local Unions Are Responsible for ERTS Registration*

60. IBEW local unions are integral to assisting plan participants traveling outside of their home jurisdictions in ERTS registration; this is because plan participants must initially register for ERTS in-person with photo identification at an assisting local union office.

61. The IBEW plan participant who is traveling outside of his home jurisdiction must register at a local union or participating fund office in order to begin the ERTS process.

62. At ERTS registration at a local union, the plan participant, or traveling employee, must sign the Participant Verification Page thereby agreeing to both the approved Authorization and Release(s) regarding reciprocal transfers under the Agreement(s) and the legally binding effect of utilization of an electronic signature on ERTS. Once the traveling employee has completed initial registration, traveling employees will receive their login information in the mail at the address provided when they register with ERTS. After that, they will be able to logon via the Internet from any location.  https://erts.ibew.com/IBEWERTS/index.htm

63. After the initial registration/blanket authorizations, which must be done in person with ID required at a local union, the plan participant will be issued a log-on and password to allow them to either modify their registration or to stop transfers. Funds will be able to exchange information and forms electronically over the ERTS. There will also be a link to a web-based Automated Clearing House ("ACH") to allow for the electronic transfer of money from fund to fund.
http://www.ibew.org/articles/02journal/0205/ert.htm

64. As of March 2005, IBEW reiterated that participating local unions were expected to assist members with registration onto ERTS on an as needed basis. Further, "[l]ocal unions have the responsibility to confirm that individuals have selected home funds for reciprocity of benefits."

65. Although traveling employees can choose not to elect a home fund, Participants still need to register on ERTS in order to make the choice not to elect a home fund.

66. By virtue of not registering with ERTS, traveling employees do not fail to elect a home fund.

67. Ballard is a "temporary employee" within the meaning of the Plan. "Temporary Employee" is defined as an employee on whose behalf contributions to this Plan are made by an Employer and who has designated a Home Fund(s) other than this Plan pursuant to the provisions of the Reciprocal Agreement.

68. The Plan requires that "**ALL AMOUNTS** received by this Plan as pension contributions on behalf of such Temporary Employee shall be transferred to the designated Home Fund." (emphasis added).

69. To be eligible for reciprocal transfers under EIPRA, Ballard needed to be registered on ERTS.

70. Contrary to the Plan's representation in its April 16, 2012 final denial, there is nothing in the Plan that restricts reciprocity to only prospective employer contributions. Rather, the Plan clearly provides that the Plan must reciprocate all contributions, which would include past contributions.

71. Local 769 was Ballard's first opportunity to register with ERTS.

72. Because Ballard previously was not working under any collective bargaining agreements and was paying dues directly to Local 125, he never needed to register for ERTS.

73. As part of its responsibilities under the Plan, Local 769 had a responsibility to check whether Ballard designated a home fund.

74. Logging onto ERTS and looking for an employee is the only way to check for a home fund designation.

75. When logging onto ERTS, a local union can run reports by a traveling employee's social security number, and the report returns the result for the member with Home Local and Fund ERTS codes information.

76. Even if Ballard did not have a designated home fund, Local 769 should have had a form attesting to this lack of designation under ERTS administrative procedure.

77. Before accepting contributions on behalf of Ballard for the Plan, Local 769 needed to check Ballard's status on ERTS.

78. Local 769 admitted it searched for Ballard on ERTS and found he was not registered.

79. Local 769, in its capacity as Trustees, either failed in its fiduciary duty to check Ballard's home fund designation, or else failed in its fiduciary duty to check ERTS for Ballard's home fund designation before accepting contributions on his behalf from Quality Line.

80. The Trustees accepted contributions on Ballard's behalf without ever offering to register Ballard on ERTS.

81. Once Local 769 discovered Ballard was not registered on ERTS, it had a fiduciary duty as Plan Administrator to notify Ballard and inquire as to his home fund designation and register him on ERTS.

82. Because he was paying his own dues during the advent of ERTS, Ballard never registered with ERTS prior to his employment with Quality Line.

83. Immediately before Ballard began working for Quality Line, he had an in-person meeting at the Local 769 Hall with Quality Line's owner, Brian Marsh, Trustee Joel Bell, and Local 769's Assistant Business Manager/Organizer, Brian Rice.

84. During that meeting on or about January 2010, Brian Rice told Ballard that Ballard had to take the journeyman/lineman tests and join Local 769 in order to work in the jurisdiction. Ballard explained that he was already a member of Local 125, and that he had over 18 years of experience, so he was exempt from the journeyman/lineman tests. In that same meeting, Trustee Joel Bell told Ballard at the meeting that Ballard would not have to take any tests or join Local 769.

85. In the meeting on or about January 2010, Ballard made it clear he did not want to join Local 769 and declined membership in Local 769.

-11-

86. The Trustees knew, based on Ballard's experience and based on its own admissions in correspondence to Ballard, that Ballard was a longstanding IBEW member from another jurisdiction.

87. The Trustees admitted that they found it hard to believe that Ballard, given his experiences with IBEW, did not know about ERTS.

88. The Trustees, through Joel Bell and Brian Rice, had actual knowledge that Ballard was a member of Local 125.

89. The Trustees, based on their admissions, had reason to believe that Ballard intended Local 125 was his local union and that Ballard would have a home fund.

90. On or about February 2010, and without consulting Ballard beforehand, Local 769 began taking Quality Line's contributions made on Ballard's behalf and depositing them into the Plan.

91. Trustees Bell and Bernard Van Pelt, both Trustees under the Plan, have been permanently enjoined from violating ERISA by the United States District Court for the Central District of California (Consent Judgment, Case No. EDCV05-0434SGL) (the "Consent Decree").

92. On or about October 2011, Ballard discovered that his pension funds were not being reciprocated to NEAP. Until October 2011, Ballard was unaware that his contributions were no longer being deposited with NEAP.

93. Once Ballard discovered employer contributions were not being sent to NEAP, Ballard asked Quality Line why he was not getting his pension contributions. Quality Line verified that Quality Line was properly sending contributions to Local 769, and Quality Line had no further knowledge about or involvement in ensuring the contributions were made to NEAP and not the Plan.

94. The Trustees admit that Quality Line was properly making employer contributions pursuant to the CBA.

95. On information and belief, employers are not responsible for guaranteeing a plan participant is registered with ERTS; instead, that is the responsibility of IBEW local unions.

96. Ballard called NEAP after speaking with Quality Line, and NEAP confirmed it had not received any contributions on Ballard's behalf since before February 2010.

97. On or about October 3, 2011, Ballard called Local 769 and discovered contributions on his behalf were going to the Plan and not being reciprocated to NEAP. Local 769 confirmed it was not reciprocating contributions on Ballard's behalf and that he was a participant in the Plan. This was the first Ballard learned of his Plan participation and realized Local 769 was not reciprocating employer contributions on his behalf to NEAP.

98. On October 3, 2011, Ballard immediately registered for ERTS, naming IBEW 125 as his "Local Union" and NEAP as his Home Fund. Ballard's ERTS registration was approved on October 7, 2011.

99. On October 17, 2011, Ballad submitted written claim to the Trustees to have Plan benefits reciprocated to NEAP, explaining that he never elected for his pension benefits to be deposited with the Plan.

100. The Trustees denied Ballard's request on December 27, 2011 (the "First Denial"), finding that Ballard's failure to register with ERTS until October 2011 precluded reciprocation of his pre-October 2011 contributions.

101. As of the First Denial, Ballard had three (3) years of vesting service under the Plan according to the Trustees.

102. To explain vesting under the Plan, a ""Plan Year" means the accounting year of the Plan which is the 12-month period commencing on July 1 and ending on the next following June 30. '"Year of Vesting Service' means each Plan Year (or period) during which the Employee is credited with at least 1,000 Hours of Service . . . Effective July 1, 1999, an Employee shall earn a Year of Vesting Service each Plan Year

-13-

(or period) during which he earns 1.0 or more units of Year of Credited Service . . . An Employee cannot earn more than one Year of Vesting Service in a Plan Year (or period)." "[A] Participant's Years of Credited Service are determined upon the basis of the contributions made on his behalf by the Employer to the [Plan]," with one Unit of Credited Service earned once an Employer Contributes $1,400.00 in a Plan Year. For each additional $140.00 in excess of $1,400.00 contributed on behalf of a Participant in a Plan Year, that Participant receives an additional one-tenth of a unit of a Year of Credited Service.

103.  "A Participant's vested interest in his Accrued Benefit will be 0% before the earliest of the following dates and will be 100% . . . **[i]f Employed by the Union**, the date the Participant is credited with five Years of Vesting Service." (emphasis added).

104.  Until Ballard could be credited with five (5) Years of Vesting Service under the Plan, his Accrued Benefit would be 0%, because he would not be fully vested in the Plan.

105.  In the First Denial, the Trustees warned Ballard against reciprocating his future benefits to NEAP until he had completed five (5) years of vesting service and thereby secured an Accrued Benefit under the Plan. According to the Trustees, Ballard would lose all Plan benefits he had accrued if he reciprocated future contributions before becoming vested in the Plan.

106.  On February 27, 2012, Ballard timely appealed the First Denial.

107.  On or about May 24, 2012, Ballard received notice that the Trustees had issued its final denial, dated April 16, 2013 (the "Final Denial").

108.  In the Final Denial, the Trustees admitted that it did not know whether Ballard was sent a Summary Plan Description ("SPD").

109.  According to the Trustees, Quality Line determined that Ballard was a Plan participant, but the Trustees do not dispute that it took contributions on Ballard's behalf, which put the Trustees on actual notice of Ballard's participation.

-14-

110. The Final Denial claimed Quality Line had to request to have the contributions returned, because they were "employer" contributions. This is, in fact, semantics, given that Ballard should receive those contributions into a designated home fund.

111. Nevertheless, Quality Line requested that the Plan return its contributions made on behalf of Ballard, so that it could send them to Local 125 on Ballard's behalf, who would then properly reciprocate the contributions to NEAP. The Plan refused, because Quality Line called the contributions "employee" contributions instead of "employer" contributions, and because the contributions "were made to the []Plan by your company pursuant to the terms of the CBA and your company was contractually obligated to make the contributions."

112. The Trustees admit that Quality Line had to make the contributions pursuant to the CBA and acknowledge that Quality Line had no authority in how the contributions were handled or reciprocated.

113. In a letter to Quality Line dated January 24, 2013, the Trustees refused to return the contributions to Quality Line "just because [the contributions] were not made to NEAP."

114. After the Final Denial, Ballard also requested the Trustees comply with its disclosure and production requirements under 29 C.F.R. §2560.503-1(h)(2)(iii), -(m)(8)(iii), and it has failed to do so.

115. At all relevant times, Local 769 actually knew or had reason to know that Ballard was a member of Local 125.

116. Local 769 admitted that it failed to send Ballard a SPD under ERISA or, at a minimum, does not know whether Ballard ever received a SPD.

117. Ballard was harmed by not being able to reciprocate employer contributions to NEAP and by becoming a Plan Participant without his consent.

118. Local 769 did not provide Ballard with a Member Benefits Statement until April 26, 2012.

119. In fact, the Plan did not provide Member Benefit Statements to any participant from February 2010 until on or about April 2012.

## COUNT I

### (Injunctive Relief)

120. All previous paragraphs are incorporated by reference.

121. 29 U.S.C. § 1132(a)(3) allows a participant, beneficiary, or fiduciary to enjoin any act or practice that violates any provision of Title I of ERISA or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or enforce any provision of Title I of ERISA or the terms of the plan.

122. The Defendants have failed to comply with ERISA and the Plan by refusing to direct Ballard's pension contribution to the correct pension fund.

123. Ballard seeks equitable relief in the nature of mandamus, ordering the Defendants to comply with ERISA and the terms of the Plan by transferring his pension contributions to the correct pension fund.

## COUNT II

### (Statutory Penalty)

124. All previous paragraphs are incorporated by reference.

125. Plan administrators are required ERISA to provide to participants automatically (and not upon request), the SPD, funding notice, and individual pension benefits statements.

126. The Plan and Plan Administrator failed to provide these to Ballard.

127. Ballard became a Plan participant in February 2010.

128. The Plan did not inform Ballard that he was a Plan participant.

129. The Plan was obligated to provide a copy of the SPD by May 31, 2010.

130. Ballard did not learn that he was a participant until October 2011.

131. Until requesting his claim file in preparation of his appeal, Ballard had never received a copy of the SPD as required by 29 U.S.C. § 1024(b)(1)(a).

132. Ballard did not receive a copy of the SPD until February 6, 2012, which was

1 616 days late.

2  133.   In addition, the Plan failed to provide the SPD or benefits statements to any
3 plan participants, including Ballard, pursuant to 29 USC §1025(a)(1)(B).

4  134.   Because Ballard did not receive the SPD, he was not notified that he
5 became a Plan Participant.

6  135.   Ballard did not forfeit his accrued benefit under the Plan and never
7 received a Pension Benefit Statement in a timely matter.

8  136.   The Trustees' failure to automatically disclose the Plan documents, namely
9 the SPD, constitutes a violation of ERISA that deprived Ballard of the opportunity to
10 learn of his participation in the Local Plan.

11  137.   Ballard never received any communication from Local 769, the Plan or the
12 Trustees disclosing his participation in the Plan.

13  138.   But for the Trustees' failure comply with its disclosure obligations as
14 mandated by ERISA, Ballard would have been informed of his participation in the Plan
15 and would have been able to register with ERTS immediately.

16  139.   Ballard had no way of knowing his need to designate NEAP as his home
17 fund when the Trustees failed to inform him that his contributions were not still going to
18 NEAP and were in fact being deposited into the Plan.

19  140.   Under 29 U.S.C. § 1132(c)(1), the court may impose a statutory penalty of
20 up to $110 per day for the failure to provide documents.

21  141.   The maximum penalty for the 616-day delay in providing the SPD to
22 Ballard is $67,760.00.

## COUNT III

### (Breach of Fiduciary Duty)

25  142.   All previous paragraphs are incorporated by reference.

26  143.   The Plan, Plan Administrator, and Trustees owed fiduciary duties to Ballard.

27  144.   The Plan's failure to provide all relevant documents (including the Plan or
28 SPD), failure to inform Ballard of all of the Plan terms (including the ERTS

-17-

1 requirements), and failure to direct his pension benefits to the correct pension plan, are breaches of fiduciary duties.

145. The Plan failed to discharge its duties with the care, skill, prudence, and diligence under the circumstance then prevailing that a prudent man acting in like capacity and familiar with such matters would use.

146. The Trustees, specifically Trustees Bell and Van Pelt, are in violation of the Consent Decree by failing to discharge their fiduciary duties as required under ERISA and as required by court order.

147. As a direct and proximate result of the breaches of fiduciary duty, Ballard incurred financial expense, including that resulting from pursuing an appeal of the Plan's wrongful and improper denial of benefits.

WHEREFORE, Ballard requests:

1) An equitable surcharge or make-whole remedies to fully compensate him for the Plan's, Plan Administrator's, and Trustees' breaches of fiduciary duty;

2) Declaration and enforcement of his rights under ERISA and the Plan;

3) A penalty under 29 U.S.C. § 1132(c)(1) in the amount of $110 per day for each day the Plan Administrator failed to provide Plan documents;

4) An order enjoining the Plan from failing to direct pension contributions to the correct home fund and requiring compliance with related ERISA regulations and Plan terms;

5) All other equitable relief available under ERISA to properly reciprocate employer contributions to NEAP, including relief to restore and make Ballard whole;

6) Attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1); and

7) Such further relief as the court deems just and proper.

-18-

1
2   Dated this 16th day of April 2013,
3
4                                   LAW OFFICES OF KEVIN KOELBEL, P.C.
5
6                                   By:   /s/Kevin Koelbel
                                          Kevin Koelbel
7                                         Erin Ronstadt
                                          Attorneys for Plaintiff

**RONSTADT LAW, P.L.L.C.**
7303 W. Boston Street
Chandler, AZ 85226
(480) 705-7550